# EXHIBIT A

SUMMONS - CIRCUIT COURT                                    3101 (Rev. 6/18)

| STATE OF ILLINOIS | UNITED STATES OF AMERICA<br>IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT | COUNTY OF DU PAGE |

**ROBERT HORVATH, et al.,**

PLAINTIFF

vs

**NADIM KHALIL ZAYED a/k/a
DEAN ZAYED, et al.,**

DEFENDANT

**2018L000784**

**CASE NUMBER**

**SUMMONS**
CIRCUIT COURT

☒ ORIGINAL ☐ ALIAS

File Stamp Here

To each Defendant: Nadim Khalil Zayed a/k/a Dean Zayed, 1745 S. Naperville Rd., Ste: 200, Naperville, IL 60189

You are Summoned and Required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance in the office of the Clerk of the Circuit Court, 505 N. County Farm Road, Wheaton, Illinois, within 30 days after service of this summons not counting the day of service.

If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

To the Officer

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service and not less than three (3) days before the date of appearance. If service cannot be made, this summons shall be returned so endorsed.

This summons may not be served later than thirty (30) days after its date.

| DATE OF SERVICE |
| --- |
| |
| TO BE INSERTED BY OFFICER ON COPY LEFT WITH DEFENDANT<br>OR OTHER PERSON |

Name: Stoltmann Law Offices, P.C. ☐ Pro Se

DuPage Attorney Number: 218972

Attorney for: Plaintiff

Address: 10 S. LaSalle Street, Suite 3500

City/State/Zip: Chicago, IL 60603

Telephone Number: 312-332-4200

Email: alex@stoltlaw.com

WITNESS:

**CHRIS KACHIROUBAS,** Clerk of the Eighteenth Judicial Circuit Court and the seal thereof, at Wheaton, Illinois

Date 07/10/2018

*Electronically Issued*

CHRIS KACHIROUBAS, Clerk

Deputy Clerk
By BURGAN,KATE
Deputy Clerk

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp.

**NOTE:**

The filing of an appearance or answer with the Circuit Court Clerk requires a statutory filing fee, payable at the time of filing.

If you need legal advice concerning your legal responsibility as a result of this summons being serviced upon you and you don't have a lawyer, you can call the DuPage Bar Association, Lawyer Referral Service at 630-653-9109.

CHRIS KACHIROUBAS, CLERK OF THE 18th JUDICIAL CIRCUIT COURT ©
WHEATON, ILLINOIS 60187-0707

Document received on 7/10/18 11:49 AM Document accepted on 07/10/2018 15:03:48 # 4316662/170431017609

SUMMONS - CIRCUIT COURT                                                    3101 (Rev. 6/18)

## SHERIFF'S FEES

Service and return ......................................................... $ _____

Miles _____ ......................................................... $ _____

**Total** ......................................................................................... $ _____

Sheriff of _____ County

## SHERIFF'S RETURN

I certify that I served this summons on defendant as follows:

☐ (a)  (Individual - **personal**):
By leaving a copy and a copy of the complaint with each individual as follows:

☐ (b)  (Individual - **abode**):
By leaving a copy and a copy of the complaint at the usual place of abode of each individual with a person of his family, of the age of 13 years or upwards, informing that person of the contents of the summons, and also by sending a copy of the summons and the complaint in a sealed envelope with postage fully prepaid, addressed to each individual at the usual place of abode, as follows:

☐ (c)  (Corporation):
By leaving a copy and a copy of the complaint with the registered agent, officer, or agent of each corporation as follows:

☐ (d)  (Other service):

☐ (e)  (Unable to Serve):
By _____ , Deputy Badge Number: _____

Name of Defendant_____

Name of Person
summons given to _____

Sex_____ Race _____ Approximate age_____

Place of service_____

City , State _____

Date of service _____ Time_____

Date of Mailing_____

Special Process Server of_____

Name of Defendant _____

Name of Person
summons given to _____

Sex _____ Race _____ Approx. age _____

Place of service _____

City , State _____

Date of service _____ Time _____

Date of Mailing _____

Sheriff of _____ County

County Illinois License #_____

By _____

DEMAND FOR A JURY TRIAL                                                          2123 (Rev. 9/16)

**STATE OF ILLINOIS**          **UNITED STATES OF AMERICA**          **COUNTY OF DU PAGE**
                    **IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**

ROBERT HORVATH, et al.,

             **PLAINTIFF / PETITIONER**

       **vs**

NADIM KHALIL ZAYED a/k/a
DEAN ZAYED, et al.,

         **DEFENDANT / RESPONDENT**

**2018L000784**

**CASE NUMBER**

*Chris Kachiroubas*
e-filed in the 18th Circuit Court
********* DuPage County *********
**TRAN# : 170431017609/( 4316662 )**
**2018L000784**
**FILEDATE: 07/10/2018**
*Date Submitted : 07/10/2018 11:49 AM*
*Date Accepted : 07/10/2018 03:04 PM*
**BURGAN,KATE**

************************

File Stamp Here

## JURY DEMAND

TO: **CHRIS KACHIROUBAS**, Clerk of the Eighteenth Judicial Circuit Court

The ☒ Plaintiff/Petitioner    in the above entitled cause demands a jury for the trial of said cause.
   ☐ Defendant/Respondent

This matter should be tried by a  ☒ jury of six
                                ☐ jury of twelve

                                   Robert Horvath, et al.
                                 Plaintiff/Petitioner

                                 Defendant/Respondent

                               Stoltmann Law Offices, P.C.
                                 Their Attorney

Name:  **Stoltmann Law Offices, P.C.**  ☐ Pro Se

DuPage Attorney Number:  **218972**

Attorney for:  **Plaintiffs**

Address:  **10 S. LaSalle Street, Suite 3500**

City/State/Zip:  **Chicago, IL 60603**

Telephone Number:  **312-332-4200**

Email:  **alex@stoltlaw.com**

**CHRIS KACHIROUBAS, CLERK OF THE 18th JUDICIAL CIRCUIT COURT**
**WHEATON, ILLINOIS 60187-0707**
Document received on 7/10/18 11:49 AM  Document accepted on 07/10/2018 15:03:44 # 4316662/170431017609

**IN THE CIRCUIT COURT FOR THE EIGHTEENTH JUDICIAL CIRCUIT**
**DUPAGE COUNTY, ILLINOIS**

ROBERT HORVATH, LORI PARK-  )
GIANFRANCISCO, THERESA L. PORTELL, )
FRANK G. PANTALEO, PATRICIA )
PANTALEO, RICHARD RUTKOWSKI, )
PHYLLIS RUTKOWSKI, SHARON )
GIAMMANCO, SALVATORE )
GIAMMANCO, and on behalf of the )
class members described below, )
                     )
       Plaintiffs, )
                     )
       v. )
                     )
NADIM KHALIL ZAYED a/k/a )
DEAN ZAYED, BROOKSTONE )
CAPITAL MANAGEMENT LLC, and )
KAIZEN ADVISORY, LLC, )
                     )
       Defendants, )
                     )

2018L000784

No.

*Chris Kachiroubas*
e-filed in the 18th Judicial Circuit Court
\*\*\*\*\*\*\*\* DuPage County \*\*\*\*\*\*\*\*
**TRAN# : 170431017609/( 4316662 )**
**2018L000784**
**FILEDATE : 07/10/2018**
*Date Submitted : 07/10/2018 11:49 AM*
*Date Accepted : 07/10/2018 03:03 PM*
**BURGAN,KATE**
10/09/2018 rm2014 9:00am
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CLASS ACTION COMPLAINT

Plaintiffs, ROBERT HORVATH, LORI PARK-GIANFRANCISCO, THERESA L.

PORTELL, FRANK G. PANTALEO AND PATRICIA PANTALEO, RICHARD

RUTKOWSKI and PHYLLIS RUTKOWSKI, and SHARON GIAMMANCO and

SALVATORE GIAMMANCO (collectively, "Plaintiffs") on behalf of class members described

below, by and through their undersigned attorneys, and for their Complaint against Defendants,

NADIM KHALIL ZAYED a/k/a DEAN ZAYED, BROOKSTONE CAPITAL

MANAGEMENT LLC, and KAIZEN ADVISORY, LLC (collectively, "Defendants"), state as

follows:

## I.    INTRODUCTION

1.    Plaintiffs are all DuPage County residents with modest personal assets who had a significant amount of their limited resources in a complicated investment scheme managed by Defendants.

2.    Defendants, also all residents of DuPage County, were in way over their heads, were not capable of managing a complicated investment scheme (KZSIX), had numerous undisclosed conflicts, and the whole scheme resulted in far greater fees than industry norms.

3.    KZSIX failed horribly when faced with the exact type of risk the scheme was represented as being designed to withstand.

4.    After it failed, Defendants admitted KZSIX was "was poorly designed and was ineffective in reducing the dramatic loss in August".

5.    Plaintiffs state claims individually and on behalf of a class of similarly situated investors for breach of fiduciary duty resulting from Defendants' mismanagement that led Plaintiffs and the Class to lose their investments totaling millions of dollars and incurring excessive fees along the way.

## II.    PARTIES

6.    Plaintiff, ROBERT HORVATH ("Horvath"), is, and at all times relevant to this action, has been a citizen of the state of Illinois, domiciled in DuPage County.

7.    Plaintiff, LORI PARK-GIANFRANCISCO ("Park"), is, and at all times relevant to this action, has been a citizen of the state of Illinois, domiciled in DuPage County.

8.    Plaintiff, THERESA L. PORTELL ("Portell"), is, and at all times relevant to this action, has been a citizen of the state of Illinois, domiciled in DuPage County.

9.    Plaintiffs, FRANK G. PANTALEO and PATRICIA PANTALEO, ("The Pantaleos"), are, and at all times relevant to this action, have been citizens of the state of Illinois, domiciled in DuPage County.

2

10.     Plaintiffs, RICHARD RUTKOWSKI and PHYLLIS RUTKOWSKI, ("The Rutkowskis"), are, and at all times relevant to this action, have been citizens of the state of Illinois, domiciled in DuPage County.

11.     Plaintiffs, SHARON and SALVATORE GIAMMAMCO ("The Giammancos") are, and at all times relevant to this action, have been citizens of the state of Illinois, domiciled in DuPage County.

12.     Defendant, NADIM KHALIL ZAYED a/k/a DEAN ZAYED ("Zayed") is, on information and belief, a resident of DuPage County, Illinois.

13.     Defendant, BROOKSTONE CAPITAL MANAGEMENT LLC f/k/a XL Advisors LLC ("BCM"), is an Illinois limited liability company with its principal place of business at 1745 South Naperville Road, Suite 200, Wheaton, Illinois 60189, DuPage County.

14.     Defendant, KAIZEN ADVISORY, LLC ("Kaizen Advisory"), is an Illinois limited liability company with its principal place of business at 1745 South Naperville Road, Suite 106, Wheaton, Illinois 60189, DuPage County.

## III.     JURISDICTION AND VENUE

15.     Pursuant to 735 ILCS 5/2-209, this Court has personal jurisdiction over all Defendants because Defendants committed the tortious acts complained of in DuPage County, Illinois.

16.     Venue in this county is proper pursuant to 735 ILCS 5/2-101, because the acts and omissions complained of occurred in this this county.

3

## IV. CLASS ALLEGATIONS

17.     Plaintiffs state claims individually and on behalf of a class of similarly situated investors for breach of fiduciary duty resulting from Defendants' conflicts of interest (or the aiding and abetting thereof), which led Plaintiffs and the Class to lose money entrusted with Defendants totaling millions of dollars and incurring excessive fees.

18.     Plaintiffs bring this case as a class action on behalf of the class of persons, defined as follows:

> All persons who were investment advisory clients of Brookstone Capital Management, LLC at some point from August 1, 2015 until August 20, 2015; were invested in the ZEGA High-Probability Options Strategy prior to August 3, 2015; and held shares in the Kaizen Hedged Premium Spreads Fund as of August 20, 2015.
>
> Excluded from the proposed Class are Defendants, their respective officers, directors, and employees, affiliates, legal representatives, heirs, successors, or assignees. Plaintiffs reserve the right to amend the Class definition as necessary.

19.     The members of the putative class are so numerous that joinder of all members is impracticable.

20.     Questions of fact and law as to all putative class members predominate over any questions affecting any individual member of the putative class, including, but not limited to:

a)  Whether Defendants, Zayed and BCM, breached their respective fiduciary duties to Plaintiffs; and

b)  Whether Defendant Kaizen Advisory aided and abetted Zayed's and BCM's breach of fiduciary duties.

21.     Plaintiffs' claims are typical of the claims of the Class because Defendants' breaches of their respective fiduciary duties (or aiding and abetting thereof) affected Plaintiffs and the Class uniformly and in precisely the same manner.

22.     Plaintiffs will fairly and adequately represent and protect the interests of the putative class. Plaintiffs have retained experienced class action counsel. The interests of Plaintiffs are coincident with and not antagonistic to the interests of the Class.

4

23.     The questions of law and fact common to the members of the putative class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

24.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joiner of all putative class members is impracticable. Moreover, because the damages suffered by individual members of the putative class may be relatively small, the expense and burden of individual litigation makes it impossible for the members of the putative class to redress the wrongs done to them individually.

25.     The putative class is readily definable and prosecution of the action as a class action will eliminate the possibility of repetitious litigation. There will be no difficulty in the management of this action as a class action.

## V.     FACTS COMMON TO ALL COUNTS

### A. ZAYED AND BCM HAD A FIDUCIARY RELATIONSHIP WITH PLAINTIFFS.

26.     Plaintiffs had personal and retirement assets in Investment Accounts with BCM between August 3, 2015 and August 26, 2015 (hereinafter "Class Period").

27.     Plaintiffs are generally "mom and pop investors" all residing in DuPage County with limited personal wealth or investment experience.

28.     At all relevant times, BCM and Zayed provided individualized, personalized, fiduciary investment management services to their clients, including Plaintiffs and the Class. (Form ADV Part 2A attached hereto as Exhibit "A" and incorporated herein).

29.     At all relevant times, in exchange for services rendered, BCM and Zayed received compensation via BCM's "Wrap Program."

30.     BCM's Wrap Program "wrapped" both the asset management fees for advisory services and the transactional fees for execution services into a single fee charged to BCM's clients, including Plaintiffs (the "BCM Wrap Program Fee").

5

31.     Zayed had sole discretion to manage Plaintiffs' portfolios in the BCM Investment Accounts, which included all trading decisions related to Plaintiffs' holdings.

32.     In selecting investments for BCM Investor Accounts, including Plaintiffs' accounts, BCM's policy was to select investment vehicles based on the length and verifiability of the track records of the investment vehicle, the tenure and/or overall career performance of the managers of the investment vehicle, the continuity of the investment vehicle's management, the investment philosophy and process of the investment vehicle, the expenses of the investment vehicle, and other factors believed to affect performance of the investment vehicle.

33.     BCM is a *per se* fiduciary as a matter of law to Plaintiffs and Class Members.

34.     BCM and Zayed owed the following duties to Plaintiffs and the Class:

a)     Undivided loyalty and utmost good faith;

b)     Not to engage in any activity in conflict with the interest of any client;

c)     Employ reasonable care to avoid misleading clients and provide full and fair disclosure of all material facts to their clients and prospective clients;

d)     Consider facts to be "material" if a reasonable investor would consider them to be important;

e)     Eliminate all conflicts of interest that might incline them, consciously or unconsciously, to render advice that is not disinterested;

f)     Disclose all conflicts of interest that might incline them, consciously or unconsciously, to render advice that is not disinterested;

g)     Make full and accurate disclosures as defined by BCM's code of ethics;

h)     Make a full and frank disclosure of any conflict, and obtain affirmative, informed consent from their clients (including Plaintiffs and the Class) to waive the conflict(s) of interest; and

i)     Not to use their clients' assets for their own benefit of the benefit of other clients.

35.     BCM and Zayed owed Plaintiffs and the Class an affirmative duty to disclose any and all conflicts of interest to customers of BCM, including Plaintiffs.

6

## B. ZAYED IS AN ILLINOIS LICENSED ATTORNEY AND INVESTMENT ADVISOR.

36.    Zayed is registered as an Investment Adviser Representative with the State of Illinois under Central Registration Depository ("CRD") No. 3267818, and holds the Securities Agent (Series 63) and Investment Adviser Representative (Series 65) registrations.

37.    Zayed is also registered with the National Futures Association ("NFA") under NFA ID No. 0492886 as a principal of Kaizen Advisory.

38.    Zayed is an Illinois licensed attorney with, shareholder and officer of the law firm Perkins & Zayed, P.C.  His practice is focused on "asset protection."

39.    BCM is owned by the Nadim Zayed Living Trust with Zayed as the Trustee of the Trust.

40.    Zayed is the founder, principal, and president of PRIZM Financial Advisors, Inc. ("PRIZM"); the president, chief executive officer, and sole beneficial owner of BCM; and the owner of at least 95% of Kaizen Advisory.

41.    Upon information and belief, Zayed had complete control of Kaizen Advisory at all relevant times and all information possessed by Zayed was possessed by Kaizen Advisory.

42.    At all relevant times, Zayed was the beneficial controlling person of both BCM and Kaizen Advisory.

43.    Kaizen Advisory, Zayed, and BCM all operated from the same Wheaton office building with common ownership.

44.    Zayed did not have full discretion over Plaintiffs accounts but was limited by his duty to make full disclosure.

45.    When Zayed entered the trades for KZSIX on behalf of Plaintiffs he did not have authority to do so because he failed to make a full disclosure.

7

## C. THE ZEGA HiPOS STRATEGY WORKED WELL BUT WAS NOT PROFITABLE FOR ZAYED AND BCM.

46.     Prior to August 10, 2015, Plaintiffs were invested in separately-managed account strategies ("SMAs") offered on BCM's platform, known as the ZEGA High-Probability Options Strategy (the "ZEGA HiPOS Strategy").

47.     The ZEGA HiPOS Strategy, managed by the sub-advisor, ZEGA, used financial modeling to ascertain potential put and call options that exhibited a high probability of expiring worthless. Within the strategy, ZEGA would write (i.e. sell) options in the market and generate revenue based upon the earned premium after the options expired.

48.     From the time that Plaintiffs established their BCM Investment Accounts through August of 2015, the BCM Wrap Program Fee for the ZEGA HiPOS Strategy was 2.25% annually of the portfolio value, which was periodically deducted from Plaintiffs' investment accounts. All of BCM's trading and operating expenses incurred in implementing the investment management of the accounts were included in this 2.25% BCM Wrap Program Fee and Plaintiffs' costs were the same regardless of the number of transactions in an account.

49.     Pursuant to the BCM Wrap Program, BCM was obligated to pay all trading expenses incurred from implementation of the ZEGA HiPOS Strategy SMAs, which reduced BCM's (and thus Zayed's) net income.

50.     In contrast to SMAs, the structure of investment companies (i.e. mutual funds) allows trading expenses and costs to be borne by the investor in the investment company.

51.     On information and belief, in or around early 2014, Zayed began searching for a program that would allow him to create a mutual fund (1) with minimal cost in terms of time and expense (including administration and regulatory compliance), (2) over which he could exert complete control, and (3) that would allow him to shift the fund's trading costs and expenses from BCM (and Zayed) to its clients, including Plaintiffs.

8

52.     On or about May 1, 2014, Zayed formed Kaizen Advisory, and, shortly thereafter, created a mutual fund known as the "Kaizen Hedged Premium Spreads Fund" ("KZSIX").

## D. NEITHER KAIZEN ADVISORY NOR ZEGA HAD EXPERIENCE OR COMPETENCY IN THE TYPE OF INVESTMENT SCHEME EMPLOYED BY KZSIX.

53.     As an open fund registered under the Investment Company Act of 1940, KZSIX had certain requirements that a separately managed account like HiPOS did not. Specifically, an open fund must report its Net-Asset-Value ("NAV") on a daily basis. Thus, a market event causing the fund's NAV to drop in the short term, could result in a rush to the exits from investors. When investors in an open-fund redeem (or sell back) their shares to the fund, the fund must sell positions to come up with the cash for the exchange. This forces the fund manager to sell liquid assets to meet these redemptions. In many cases, especially if there are mass redemptions, the fund is forced to sell distressed assets causing a rapid decline in the fund's NAV.

54.     Zayed designed KZSIX to generally use the same basic type of investing objective as the ZEGA HiPOS Strategy (i.e. selling put and call options), but with added "features."

55.     At all relevant times, BCM claimed that KZSIX was a lower risk investment compared to the HiPOS strategy because it would utilize a hedging strategy to mitigate losses during market declines. To hedge, KZSIX would purchase and sell call and put options or futures on the CBOE Volatility Index ("the VIX"), which typically increases during sudden and extreme market declines.

56.     Kaizen Advisory had never before managed any accounts or funds that were like the investment strategy that was to be executed for KZSIX.

57.     Kaizen Advisory selected ZEGA as its sub-advisor to KZSIX.

9

58. ZEGA had not managed any accounts or funds that were like the investment strategy of KZSIX.

59. Prior to acting as sub-advisor for KZSIX, ZEGA had managed accounts using its High Probability Options Strategy ("HiPOS").

60. ZEGA's HiPOS strategy did not utilize a hedge on the CBOE Volatility Index ("VIX").

61. ZEGA had little or no experience managing accounts or funds using both HiPOS and a VIX hedge.

62. ZEGA's utilization of the VIX was not a hedge to index options on the Russell 2000 and the NASDAQ 100 indexes.

63. Any spread position ZEGA would employ in KZSIX using index options on the Russell 2000 and/or NASDAQ 100 indexes could not be hedged by the VIX.

64. ZEGA and Kaizen Advisory failed to utilize CBOE Russell 2000 Volatility Index (the "RUT") options to hedge positions based on the Russell 2000 Index.

65. ZEGA and Kaizen Advisory failed to utilize of CBOE NASDAQ 100 Volatility Index (the "VXN") options to hedge positions based on the Nasdaq 100 Index.

66. Kaizen Advisory and ZEGA failed to utilize back-testing of KZSIX's trading strategy on relevant historical data to ensure the viability of the strategy before KZSIX risked actual capital of Plaintiffs and the Class.

67. If Kaizen Advisory and ZEGA had obtained back testing of the KZSIX strategy, the back testing could have tested the effectiveness of the hedging strategy on "black swan" events like those involving market events similar to what occurred in August of 2015.

68. If Kaizen Advisory and ZEGA had obtained back testing of the KZSIX strategy, they could have tested the effectiveness of hedging different index options with VIX options.

Document received on 7/10/18 11:49 AM  Document accepted on 07/10/2018 15:03:55 # 4316662/170431017609

69.     On information and belief, Zayed intended to use investment money provided by BCM Investment Accounts held by Plaintiffs and the Class to test the viability of KZSIX's investment strategy, prior to marketing the fund to non-BCM clients.

70.     Zayed's intention to test the viability of KZSIX's investment strategy with money provided by Plaintiffs and the Class was a conflict of interest, in that Zayed invested his clients' (i.e. Plaintiffs' and the Class's) money in an investment vehicle that he controlled, and of which he would not know the performance returns until after he invested his clients' money into the vehicle.

### E. ZAYED'S DECISION TO INVEST ASSETS OF BCM'S CLIENTS IN KZSIX WAS MOVITATED BY INCREASED ADVISOR FEES.

71.     At all relevant times, Zayed caused KZSIX to charge an expense fee of 1.85%, which was chargeable to the respective BCM Investment Account that held shares of KZSIX.

72.     At all relevant times, in addition to the 1.85% fee charged by KZSIX, Zayed caused BCM to charge a separate fee of 1.00%, which was also chargeable to the respective BCM Investment Account that held shares of KZSIX.

73.     The total fee charged against BCM Investment Accounts was 2.85% of the value of KZSIX that was held in each respective account.

### F. IN JULY 2015 BCM AND ZAYED SENT A LETTER TO PLAINTIFFS AND THE CLASS PROMOTING KZSIX.

74.     In or around July of 2015, BCM through Zayed announced by letter (the "July Letter") that BCM was making changes to the platforms that "were imperative to maintaining the best solutions for [Plaintiffs'] investment needs." (July Letter attached hereto as Exhibit "B" and incorporated herein)

75.     In the July Letter, BCM announced that it was removing the ZEGA HiPOS strategies from its platform for all clients except those who invested $250,000 or more in the

11

ZEGA HiPOS Aggressive strategy. Simultaneously, BCM announced that it had added a new mutual fund product to its portfolio, KZSIX.

76.   In the July Letter Zayed made the following representations to Plaintiffs:

a)   Plaintiffs' investments in ZEGA's HiPOS strategies would be transferred by Zayed and BCM into KZSIX;

b)   Kaizen is a registered investment advisor under common ownership with BCM;

c)   Zayed promoted the investment in KZSIX by stating that the "ZEGA investment team" would be following the same trading strategy in managing KZSIX that ZEGA employed in managing the HiPOS strategy in Plaintiffs' accounts;

d)   KZSIX would employ "different spread trades throughout a month, placing trades on multiple indices with various expirations," unlike the HiPOS strategy that constrained trading to only two or four individual option contracts;

e)   Zayed promoted KZSIX by touting its use of a hedging strategy that Zayed claimed would mitigate losses in a sudden and extreme decline in the market through the purchase and sale of call and put options on the VIX; and

f)   The addition of the VIX hedge to the HiPOS strategy would protect the portfolio from catastrophic losses during a market dislocation and even a "black swan" event.

77.   As of the date when Plaintiffs first received the July Letter, KZSIX's prospectus had not been uploaded to BCM's website and the July Letter did not provide Plaintiffs with the specific uniform resource locator ("URL") of KZSIX's prospectus.

78.   Plaintiffs did not provide Defendants with express consent to receive prospectuses on BCM's website.

79.   Plaintiffs did not access KZSIX's prospectus from BCM's website.

**G.   DEFENDANTS CHARGED EXCESSIVE FEES TO PLAINTIFFS AND THE CLASS AS A RESULT OF THE CHANGE TO KZSIX.**

80.   Zayed, BCM, Kaizen Advisory, and KZSIX charged fees far in excess of the industry standard.

81.   According to Morningstar (a mutual-fund rating and analysis company), a 1.85% expense ratio is high for any fund. According to the Financial Industry Regulatory Authority

12

("FINRA"), the average expense ratio for "long/short" funds like KZSIX is 1.59%, and the average expense ratio for growth funds is 1.00%.

82.     Previously, Zayed and BCM charged Plaintiffs and the Class 2.25% of the value of the assets that Zayed and BCM had allocated to the ZEGA HiPOS Strategy.

83.     Thus, instead of paying 2.25% of the assets under management by BCM invested in the HiPOS strategy, investors pay 2.85% per year for "essentially the same" trading strategy inside a mutual fund wrapper. This is an extremely high yearly fee to pay for a mutual fund and investment advice.

84.     Zayed, through BCM and Kaizen Advisory, created a conflict of interest by "double dipping," in that Zayed benefited from the payment of both advisory fees and fund management fees from Plaintiffs and the Class. This is a material conflict of interest and BCM vacillated on how it would ultimately disclose these fees and the automatic nature of the "switch" to the Plaintiffs.

85.     Kaizen Advisory was paid an advisory fee by KZSIX that was:

    a)     Above the median advisory fees of comparable funds in KZSIX's peer group as selected by Morningstar, Inc.;

    b)     Above the median advisory fees of Morningstar, Inc.'s Managed Futures fund universe;

    c)     Higher than the median total expenses ratio of comparable funds in KZSIX's peer group as selected by Morningstar, Inc.; and

    d)     Higher than the median total expenses of funds in Morningstar, Inc.'s Managed Futures fund universe.

**H.     THE INVESTMENT IN KZSIX OCCURRED ON OR AROUND AUGUST 10, 2015 AND THE FUND CRASHED SHORTLY THEREAFTER.**

86.     Prior to August 2015, Zayed caused Plaintiffs' BCM Investment Accounts to be invested in the ZEGA HiPOS.

87.     On or around early to mid-August, 2015, Zayed caused Plaintiffs' funds to be transferred into KZSIX, and KZSIX began trading shortly thereafter.

13

88.     At all times relevant, Zayed and BCM have failed to obtain their clients' (including Plaintiffs' and the Class's) affirmative, informed consent to waive the conflicts of interest created by Zayed's dual capacities: acting as controller of both BCM and Kaizen Advisory.

89.     At the close of trading on August 10, 2015, KZSIX's net asset value ("NAV") was $10.06 per share.

90.     On or about August 17, 2015, KZSIX became fully invested in a bullish credit spread position.

91.     At the same time, KZSIX attempted to hedge the short and near term credit spread positions in the portfolio with longer term option contracts on the VIX index.

92.     From August 17, 2015 to August 25, 2015, KZSIX lost 31.60% of its value.

93.     The "VIX Hedge" employed by ZEGA was poorly designed and ineffective in reducing the loss.

## I.     KZSIX FAILED MISERABLY WEEKS AFTER OPENING.

94.     The "VIX Hedge" employed by KZSIX was poorly designed and ineffective as a market hedge.

95.     On Friday, August 21, the NAV of KZSIX dropped 16.65%, followed by an additional 23.7% drop on Monday, August 24.

96.     From August 17, 2015 to August 25, 2015, KZSIX lost 31.60% of its value.

97.     Although the stock market in general suffered a loss during on the August 17 to August 25 period, the stock market quickly recovered, while KZSIX did not.

98.     As of December 31, 2015, the S&P 500 index (a general gauge of the performance of the stock market) closed at 2,043.94 (up 8.21 points, or 0.4% from its August 20, 2015 close).

Document received on 7/10/18 11:49 AM Document accepted on 07/10/2018 15:03:55 # 4316662/170431017609

99.    As of December 31, 2015, KZSIX closed at 7.60 (down 2.07 points, or 21.4% from its August 20, 2015 close).

100.    Below is a graph of the performance of the S&P 500, the Morningstar "Long/Short Equity" benchmark, and KZSIX, reflecting the sudden drop in KZSIX and its gross underperformance compared to both the S&P 500 and the "Long/Short" index.  KZSIX was broken and failed as a product the moment it was tested in adverse market conditions. Remarkably, the Long/Short benchmark, which is the orange (darkest) line, out-performed the S&P 500 during the August 2015 correction, but KZSIX lost more than triple the S&P 500.



101.    KZSIX was dramatically more susceptible to the volatility experienced by the broader markets than BCM represented it to be.

102.    Plaintiffs' investments and losses are summarized in the table below:

| Investor | | Amount Invested | Losses |
| --- | --- | --- | --- |
| Horvath | XXX-XXX084 | $72,665.91 | $19,791.71 |
| | XXX-XXX032 | $23,567.73 | $6,419.04 |
| Park | XXX-XXX793 | $51,702.62 | $13,773.66 |
| Portell | XXX-XXX189 | $58,696.25 | $15,403.39 |
| Pantaleo | XXX-XXX418 | $54,016.85 | $14,175.40 |

15

| | | $50,909.67 | $13,359.99 |
| | XXX-XXX483 | $50,909.67 | $13,359.99 |
| Rutkowski | XXX-XXX386 | $48,652.82 | $13,009.55 |
| | XXX-XXX384 | $60,400.47 | $16,150.82 |
| Giammanco | XXX-XXX783 | $75,587.20 | $19,535.46 |
| | XXX-XXX583 | $21,171.88 | $5,240.36 |
| **TOTAL** | | $517,371.40 | **$136,859.38** |
| | | | |

103.   In December 2015, KZSIX issued a statement to shareholders informing them of the demise of their investment stating in pertinent part:

> In our review of the performance of the Fund as managed by the Sub-advisor, we came to two conclusions.  First, that during the August period, the hedge was poorly designed and was ineffective in reducing the dramatic loss in August.  In fact, it only reduced the loss by 8%.  Secondly, the recovery was modest due to the under-investment in credit spreads during the months of September and October, never exceeding 60% of the investment potential.  As a result, we lost confidence in the Sub-Advisor and decided to replace them with Michael Thompson, CFA, and D. Matthew Thompson, CFA, Kaizen's Chief investment Officer and Head of Research respectively.

104.   KZSIX received MarketWatch's "Lump of Coal" award in December 2015. According to MarketWatch, "the Kaizen fund's [KZSIX's] plunge represented the two single-worst performance days registered by any fund so far this year."

Document received on 7/10/18 11:49 AM  Document accepted on 07/10/2018 15:03:55 # 4316662/170431017609

## VI.    CLAIMS

### COUNT I
### Breach of Fiduciary Duty
### *Nadim Khalil Zayed*

105.    Plaintiffs, individually and on behalf the Class, restate and reallege paragraphs 1 through 104 as though fully set forth herein as paragraph 105.

106.    As an investment adviser, Zayed had superior knowledge, expertise, and skills in investing, which were skills Plaintiffs did not have.

107.    Plaintiffs reposed complete trust and confidence in Zayed that he would act in their best interests.

108.    Through that trust and confidence, Zayed gained influence and superiority over Plaintiffs relative to their retirement and/or investment accounts and the use of the investment monies contained therein.

109.    As an investment adviser representative, Zayed owed fiduciary duties to his clients, including Plaintiffs, including the duties of utmost loyalty, good faith, full and fair disclosures, and the duty to:

    a) Provide investment advice that is in Plaintiffs' best interest;

    b) Refrain from engaging in activities that conflict with Plaintiffs' interests;

    c) Make full and frank disclosure of Zayed's and BCM's conflicts of interest, to the extent such conflicts cannot be avoided; and

    d) Not use Plaintiffs' assets for Zayed's own benefit.

110.    Zayed breached the fiduciary duties he owed to Plaintiffs by:

    a) Failing to receive affirmative informed consent from Plaintiffs and the Class to waive all conflicts of interest between Zayed and BCM, and Plaintiffs, including but not limited to conflicts related to Zayed's ownership of BCM and Kaizen Advisory, and Zayed's use of discretion for his own personal benefit;

    b) Using his trading discretion to make investment decisions that were primarily designed to benefit Zayed, without regard to Plaintiffs' risk exposure, and that, due to their speculative nature and/or improper hedge-structuring, were unsuitable for Plaintiffs' investment needs;

Document received on 7/10/18 11:49 AM Document accepted on 07/10/2018 15:03:55 # 4316662/170431017609

    c) Using Plaintiffs and the Class as "guinea pigs" to test the viability of KZSIX's investment strategy without using expensive backtesting;

    d) Making trades without authority to do so;

    e) Concealing his conflicts of interest from Plaintiffs at all times; and

    f) Other breaches of fiduciary duties detailed herein.

111.    Zayed's breaches of his fiduciary duties caused injuries to Plaintiffs and the Class.

112.    Plaintiffs could not have discovered the conflicts of interest of BCM, Kaizen Advisory, and Zayed inherent in their KZSIX transactions through a reasonable inquiry or inspection.

113.    Zayed unjustly profited from his breaches of duty in that he, acting through his agents and the entities under his control, received increased advisory fees due to the larger advisory fee structure of KZSIX.

114.    As a direct and proximate result of Zayed's breach, Plaintiffs and the Class have suffered damages, which consist of investment losses caused by Zayed's breach, recovery of monies paid to Zayed, and the entities under his control and lost interest.

115.    As a direct and proximate result of Zayed's breaches of fiduciary duty as detailed herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs and the Class pray for judgment against Nadim Khalil Zayed for:

    a) Finding that this action satisfies the prerequisites for maintenance as a class action as set forth in 735 ILCS 5/2-801, and certifying the proposed Class as defined herein;

    b) Designating Plaintiffs as representative of the proposed Class, and Alexander N. Loftus, Esq. and John Burke, Esq. as Co-Lead Counsel;

    c) All actual and compensatory damages caused by Zayed's breach including loss of interest and reasonable costs;

    d) Exemplary damages; and in the alternative,

    e) Nominal damages; and

    f) Any and all further relief that this Court deems just and appropriate.

## COUNT II
### Breach of Fiduciary Duty
#### *Brookstone Capital Management LLC*

116.    Plaintiffs, individually and on behalf the Class, restate and reallege paragraphs 1 through 104 as though fully set forth herein as paragraph 116.

117.    As an investment advisory firm with full discretion to effect transactions in Plaintiffs' investment portfolios, BCM owed fiduciary duties to its clients, including Plaintiffs, including the duties of utmost loyalty, good faith, and full and fair disclosures.

118.    Plaintiffs were customers of BCM at all times relevant.

119.    As customers of BCM, Plaintiffs reposed complete trust and confidence in BCM that it would act in their best interests at all times.

120.    Through that trust and confidence, BCM gained influence and superiority over Plaintiffs relative to their retirement and/or investment accounts and the use of the investment monies contained therein.

121.    BCM owed fiduciary duties to Plaintiffs, including the duty to:

  a)  Provide investment advice that is in Plaintiffs' best interest;

  b)  Refrain from engaging in activities that conflict with Plaintiffs' interests;

  c)  Make full and frank disclosure of Zayed's and BCM's conflicts of interest, to the extent such conflicts cannot be avoided; and

  d)  Not use Plaintiffs' assets for BCM or its principal's own benefit.

122.    BCM breached the fiduciary duties it owed to Plaintiffs by:

  a)  Failing to receive affirmative informed consent from Plaintiffs and the Class to waive all conflicts of interest between Zayed and BCM, and Plaintiffs, including but not limited to conflicts related to Zayed's ownership of BCM and Kaizen Advisory, and Zayed's use of discretion for his own personal benefit;

  b)  Using its trading discretion to make investment decisions that were primarily designed to benefit Zayed, without regard to Plaintiffs' risk exposure, and that, due to their speculative nature and/or improper hedge-structuring, were unsuitable for Plaintiffs' investment needs;

  c)  Making trades without authority to do so;

19

    d) Using Plaintiffs and the Class as "guinea pigs" to test the viability of KZSIX's investment strategy without using expensive backtesting;

    e) Concealing their conflicts of interest from Plaintiffs at all times; and

    f) Other breaches of fiduciary duties detailed herein.

123.    BCM's breaches of its fiduciary duties caused injuries to Plaintiffs and the putative class members.

124.    Plaintiffs could not have discovered the conflicts of interest of BCM, Kaizen Advisory, and Zayed inherent in their KZSIX transactions through a reasonable inquiry or inspection.

125.    BCM unjustly profited from its breaches of duty in that it shifted the investments of Plaintiffs and the putative class members from an SMA structure to a mutual fund structure, and thereby reduced its investment and operating expenses.

126.    As a direct and proximate result of BCM's breach, Plaintiffs and the Class have suffered damages, which consist of investment losses caused by BCM's breach, and recovery of monies paid to BCM and the entities under its control and lost interest.

127.    Due to BCM's misconduct as described above, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs and the Class pray for judgment against Brookstone Capital Management, LLC for:

    a) Finding that this action satisfies the prerequisites for maintenance as a class action as set forth in 735 ILCS 5/2-801, and certifying the proposed Class as defined herein;

    b) Designating Plaintiffs as representative of the proposed Class, and Alexander N. Loftus, Esq. and John Burke, Esq. as Co-Lead Counsel;

    c) All actual and compensatory damages caused by BCM's breach including loss of interest and reasonable costs;

    d) Exemplary damages; and in the alternative,

Document received on 7/10/18 11:49 AM  Document accepted on 07/10/2018 15:03:55 # 4316662/170431017609

e) Nominal damages; and

f) Any and all further relief that this Court deems just and appropriate.

## COUNT III
### Aiding and Abetting Breach of Fiduciary Duty
#### *Kaizen Advisory*

128. Plaintiffs, individually and on behalf the Class, restate and reallege paragraphs 1 through 104, as though fully set forth herein as paragraph 128.

129. As alleged herein Zayed and BCM caused injury to Plaintiffs and the Class through their respective breaches of fiduciary duty.

130. Kaizen Advisory, individually and on behalf of Zayed, was aware of its role as a party of the tortious activity by Zayed.

131. Kaizen Advisory knew that, as an investment advisor, Zayed owed fiduciary duties to Plaintiffs and the Class as an investment advisor.

132. Zayed breached the fiduciary duties he owed to Plaintiffs by:

a) Failing to disclose all conflicts of interest between Zayed and BCM, and Plaintiffs, including but not limited to conflicts related to Zayed's ownership of BCM and Kaizen Advisory, and Zayed's use of discretion for his own personal benefit;

b) Using his trading discretion to make investment decisions that were primarily designed to benefit Zayed, without regard to Plaintiffs' risk exposure, and that, due to their speculative nature and/or improper hedge-structuring, were unsuitable for Plaintiffs' investment needs;

c) Using Plaintiffs and the Class as "guinea pigs" to test the viability of KZSIX's investment strategy without using expensive backtesting;

d) Concealing his conflicts of interest from Plaintiffs at all times; and

e) Other breaches of fiduciary duties detailed herein.

133. Kaizen Advisory, individually and on behalf of Zayed, knowingly and substantially assisted in Zayed's breach of fiduciary duty in order to benefit Kaizen Advisory and Zayed in one or more of the following ways:

21

a) Allowing Zayed to engage in self-dealing by accepting the transfer of money from BCM Investment Accounts for the benefit of Plaintiffs and the Class into KZSIX, without first obtaining the affirmative informed consent of Plaintiffs and the Class; and

b) Providing Zayed with a third-party entity (Kaizen Advisory) through which to engage in self-dealing.

134.    As a direct and proximate result of Zayed's breaches of fiduciary duty as detailed herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

135.    Plaintiffs could not have discovered the conflicts of interest of BCM, Kaizen Advisory, and Zayed inherent in their KZSIX transactions through a reasonable inquiry or inspection.

Document received on 7/10/18 11:49 AM  Document accepted on 07/10/2018 15:03:55 # 4316662/170431017609

WHEREFORE, Plaintiffs and the Class pray for judgment against Kaizen Advisory, LLC for:

a) Finding that this action satisfies the prerequisites for maintenance as a class action as set forth in 735 ILCS 5/2-801, and certifying the proposed Class as defined herein;

b) Designating Plaintiffs as representative of the proposed Class, and Alexander N. Loftus, Esq. and John Burke, Esq. as Co-Lead Counsel;

c) All actual and compensatory damages caused by Zayed's breach including loss of interest and reasonable costs;

d) Exemplary damages; and in the alternative,

f) Nominal damages; and

g) Any and all further relief that this Court deems just and appropriate.

Dated: July 10, 2018                                Respectfully Submitted,

                                                    _/s/Alexander N. Loftus_____
                                                    One of Plaintiffs' Attorneys

Alexander Loftus, Esq. (ARDC #6303484)
Ryan Moore, Esq. (ARDC # 6317460)
STOLTMANN LAW OFFICES, P.C.
10 S. LaSalle, 35th Floor
Chicago, Illinois 60603
T: 312.332.4200
C: 312.772.5396
alex@stoltlaw.com
ryan@stoltlaw.com
DuPage Attorney No: 218972


John S. Burke (ARDC #6208743)
Jared M. Schneider (ARDC #6318314)
HIGGINS & BURKE, P.C.
2560 Foxfield Road, Suite 200
Saint Charles, Illinois 60174

23

*ROBERT HORVATH, ET AL*

*v.*

*NADIM KHALIL ZAYED a/k/a DEAN ZAYED,*
*BROOKSTONE CAPITAL MANAGEMENT*
*LLC, and KAIZEN ADVISORY, LLC,*

# EXHIBIT A

**Form ADV Part 2 Brochure**
**Dated February 1, 2013**

**Brookstone Capital Management, LLC**
1751 S. Naperville Road, Suite 208
Wheaton, IL 60189
Phone Number (630) 653-1400
www.brookstonecm.com

This Form ADV Part 2 ("Brochure") provides information about the qualifications and business practices of Brookstone Capital Management, LLC, CRD Number 141413. If you have any questions about the contents of this Brochure, please contact us at (630) 653-1400. The information in this Brochure has not been approved or verified by the United States Securities and Exchange Commission ("SEC") or by any other state securities authority.

Additional information about Brookstone Capital Management, LLC is also available on the SEC's website at www.adviserinfo.sec.gov.

Brookstone Capital Management is a registered Investment Advisor. However, please note that registration as an Investment Advisor does not imply any level of skill or training.

25

ITEM 2 - MATERIAL CHANGES

This Brochure, dated February 1, 2013, has material changes to Item 4. This brochure reflects a change in firm ownership and management.

2

Document received on 7/10/18 11:49 AM  Document accepted on 07/10/2018 15:03:55 # 4316662/170431017609

ITEM 3 – TABLE OF CONTENTS

| ITEM Number | Title | Page Number(s) |
|---|---|---|
| 1 | Cover Page | 1 |
| 2 | Material Changes | 2 |
| 3 | Table of Contents | 3 |
| 4 | Advisory Business | 4-5 |
| 5 | Fees and Compensation | 5-9 |
| 6 | Performance Based Fees & Side-By-Side Management | 9 |
| 7 | Types of Clients | 9 |
| 8 | Methods of Analysis, Investment Strategies, and Risk of Loss | 9-10 |
| 9 | Disciplinary Information | 10 |
| 10 | Other Financial Industry Activities & Affiliations | 10-11 |
| 11 | Code of Ethics, Participation or Interest in Client Transactions, & Personal Trading | 11-12 |
| 12 | Brokerage Practices | 12-16 |
| 13 | Review of Accounts | 16 |
| 14 | Client Referrals & Other Compensation | 16-17 |
| 15 | Custody | 17 |
| 16 | Investment Discretion | 17 |
| 17 | Voting Client Securities | 18 |
| 18 | Financial Information | 18 |
| 19 | State Registered Advisors | 18 |

3

27

ITEM 4   ADVISORY BUSINESS

Brookstone Capital Management, LLC ("Brookstone") is an SEC registered Investment Advisory firm. The firm is owned by Dean Zayed, with principal management provided by Dean Zayed, President, and Courtney Bonstrom, Chief Compliance Officer

Formed in 2006, Brookstone provides fee-based asset management services for clients, as well as comprehensive financial planning services, as outlined below.

As of 12/31/2012, the firm managed a total of $545,805,340 in Discretionary assets on behalf of clients. Services are provided to individuals, families, retirement plans, trusts, estates, charitable organizations, or other business entities.

Asset Management Services:

Brookstone Capital Management's principal service is providing fee-based investment advisory services. The advisor practices management of portfolios, on a discretionary basis, according to the client's objectives. The advisor uses mutual funds, exchange traded funds, unit investment trusts, real estate investment trusts, Structured Products (including certificates of deposit and notes), and options in securities to accomplish this objective. The advisor's primary approach is to use a tactical allocation strategy aimed at reducing risk and increasing performance. A client's portfolio is allocated according to the client's risk profile. The advisor measures and selects mutual funds based on length and verifiability of track record, the fund manager's tenure and/or overall career performance, the fund management continuity, investment philosophy and process, fund expenses, and other factors believed to effect fund performance. The advisor may recommend, on occasion, redistributing investment allocations to diversify the portfolio in an effort to reduce risk and increase performance. The advisor may recommend specific investments to increase sector weighting and/or dividend potential. The advisor may recommend employing cash positions as a possible hedge against market movement which may adversely affect the portfolio. The advisor may recommend selling positions for reasons that include, but are not limited to, harvesting capital gains or losses, business or sector risk exposure to a specific security or class of securities, overvaluation or overweighting of the position(s) in the portfolio, change in risk tolerance of client, or any risk deemed unacceptable for the client's risk tolerance.

Financial Planning Services:

Brookstone Capital Management LLC also offers comprehensive financial planning services for individuals, families and businesses. Our Financial Planning services include data gathering and analysis, along with creating a financial plan with specific recommendations and implementation advice tailored to client needs. Specific areas of advice include investment planning, insurance needs assessment and advice, retirement planning, cash flow management, debt consolidation, capital needs assessments, educational planning, estate planning, and business planning.

The above listed advisory services can tailored to each client – as such, if any client requires any restrictions on any types of stocks or market segments, the client needs to

4

28

inform their Advisory Representative of the restrictions in writing. If, for any reason, the firm is not able to meet the client restrictions, the firm will notify the client of that fact so that the client can determine their requirements and needs.

## ITEM 5 – FEES AND COMPENSATION

### Asset Management Fees:

Pursuant to an investment advisory contract signed by each client, the client will pay Brookstone a quarterly Management/Wrap Program Fee, payable in arrears, based on the amount of the assets to be managed by the advisor as of the opening of business on the first business day of each quarter.

| Asset Valuation | Investment Advisory Fee: | Investment Consultant Fee: | Total Fee: |
|---|---|---|---|
| $50,000 - $500,000 | 0.2% | 0.25% | 0.45% |
| Next $500,000 | 0.175% | 0.225% | 0.4% |
| Next $1,000,000 | 0.125% | 0.1875% | 0.3125% |
| Next $3,000,000 | 0.10% | 0.125% | 0.225% |

The firm offers a 'Laddered Bond & CD Portfolio'. This model is made up of individual bonds or CD's. The Bond Portfolio holds only individual investment grade corporate bonds, municipal bonds and CDs. The Bond Portfolio will be laddered. Laddering is a portfolio management strategy for fixed income whereby multiple bonds and or CDs are purchased, each with different maturity dates. Fees for the program, billed quarterly in arrears, are as follows:

| Asset Valuation | Investment Advisory Fee: | Referring Investment Consultant Fee: | Total Fee: |
|---|---|---|---|
| $50,000 - $500,000 | 0.10% | 0.25% | 0.35% |
| Next $500,000 | 0.10% | 0.225% | 0.325% |
| Next $1,000,000 | 0.10% | 0.1875% | 0.2875% |
| Next $3,000,000 | 0.10% | 0.125% | 0.225% |

Brookstone also offers the 'Brookstone Bond Asset Allocation Program'. This program is designed to allocate Client's assets among Funds selected by Brookstone based on buy and sell signals provided by BTS Asset Management, an unaffiliated third-party timing service. The number of Funds selected and the allocation percentages shall be determined by Brookstone Capital Management. Client understands that the purpose of the program is to attempt to provide downside protection in a falling market and appreciation possibilities in a rising market, by exchanging investments in the Funds selected by BCM upon buy and sell signals provided by BTS Asset Management. The Bond Asset Allocation Program will utilize a defensive (money market) fund and 2

8

29

aggressive (government and high yield) funds. Using buy and sell signals, BCM will attempt to allocate assets to the bond sector producing the highest current return when bond prices are rising, or conversely to preserve capital by moving to the money market fund if bonds sectors are declining. Client provides Brookstone with discretionary authority to affect exchanges in accordance with the receipt of BTS's buy and sell signals.

Clients who participate in the 'Brookstone Bond Asset Allocation Program' pay a quarterly management/wrap program fee, payable in arrears, based on the amount of the assets to be managed by the advisor in the program as of the opening of business on the first business day of each quarter.

| Assets Under Management | Management Fee | Representative Fee |
|---|---|---|
| First $100,000 | 0.3125% | |
| Next $100,000 - $249,999 | 0.25% | |
| Next $250,000 - $499,999 | 0.1875% | 0.375% maximum fee |
| Next $500,000 - $999,999 | 0.125% | |
| Next 1 million + | 0.10% | |

Brookstone also offers Portfolio Thermostat Matrix strategy as offered by a subadvisor Canterbury Investment Management LLC, a SEC Registered Investment Advisor. The Thermostat Matrix process identifies 12 different Market States. Each Market State is based on combining the long term trend, medium term and short term changes in volatility, and a combination of short term market indicators. The number of funds and allocation percentages shall be determined by Canterbury Investment Management and Brookstone shall execute trades based upon buy and sell signals provided by Canterbury Investment Management. Client provides Brookstone with discretionary authority to affect exchanges in accordance with the receipt of Canterbury's Buy and sell signals.

Clients who participate in the 'Portfolio Thermostat Matrix' pay a quarterly management/wrap program fee, payable in arrears, based on the amount of the assets to be managed by the advisor in the program as of the opening of business on the first business day of each quarter and are as follows.

| Asset Valuation | Investment Advisory Fee | Investment Consultant Fee | Total Fee |
|---|---|---|---|
| $60,000 - $500,000 | 0.3125% | .25% | 0.3625% |
| $500,001 - $1,000,000 | 0.2875% | 0.2125% | 0.5% |
| Over $1,000.00 | 0.25% | 0.1875% | 0.4375% |

Finally, the firm offers the 'SmartOption' program as offered by a subadvisor, Swan Wealth Advisors, Inc. This SmartOption model is made up of the S&P 500 (though an exchange traded fund), as well as options. There is a $60,000 minimum account size for participation in the SmartOption program. Brookstone's portion of the Investment Advisory Fee collected is shared with the subadvisor, Swan Wealth Advisors, Inc. Fees for the program, billed quarterly in arrears, are as follows:

30

| Asset Value ($)s | Investment Advisory Fee | Investment Consultant Fee | Total Fee |
|---|---|---|---|
| $60,000 - $560,000 | 0.3125% | .25% | 0.5625% |
| $560,001 - $1,000,000 | 0.2875% | 0.2125% | 0.5% |
| Over $1,000,00 | 0.25% | 0.1875% | 0.4375% |

Fees may be negotiated by the advisor under unusual circumstances, at the sole discretion of the advisor. Asset management fees will be automatically deducted from the client account on a quarterly basis by the custodian.

All fees paid to Brookstone Capital Management LLC for investment advisory services are separate and distinct from the expenses charged by mutual funds to their shareholders and the product sponsor in the case of variable insurance products. These fees and expenses are described in each fund's or variable product's prospectus. These fees will generally include a management fee, other fund expenses, and a possible distribution fee. If the sponsor also imposes sales charges, a client may pay an initial or deferred sales or surrender charge. A client could invest in these products directly, without the services of Brookstone Capital Management LLC. In that case, the client would not receive the services provided by Brookstone Capital Management LLC which are designed, among other things, to assist the client in determining which products or services are most appropriate to each client's financial condition and objectives. Accordingly, the client should review both the fees charged by the product sponsor and the fees charged by Brookstone Capital Management LLC to fully understand the total fees to be paid.

Clients may request to terminate their advisory contract with Brookstone Capital Management LLC, in whole or in part, by providing 30 days advance written notice. If the Form ADV Part II is not delivered at least forty eight (48) hours before the client enters into the contract, then the client has the right to terminate the contract within five (5) business days after entering into it without penalty. Upon termination, any fees paid in advance will be prorated to the date of termination and any excess will be refunded to client. Client's advisory agreement with the Advisor is non-transferable without Client's written approval.

In addition from time to time, we initiate incentive programs for Investment Advisor Representatives. These programs may compensate them for attracting new assets and Clients promoting investment advisory services. We may also initiate programs that reward Representatives who meet total production criteria, participate in advanced training and/or improve Client service. Representatives who participate in these incentive programs may be rewarded with cash and/or non-cash compensation, such as deferred compensation, bonuses, training symposiums, marketing assistance and recognition trips.

Financial Planning Services Fees:

7

31

Brookstone Capital Management LLC also offers comprehensive financial planning services for individuals, families and businesses. Our Financial Planning services include data gathering and analysis, along with creating a financial plan with specific recommendations and implementation advice tailored to client needs. Specific areas of advice include investment planning, insurance needs assessment and advice, retirement planning, cash flow management, debt consolidation, capital needs assessments, educational planning, estate planning, and business planning.

In the majority of cases, the firm charges an hourly fee of $169 per hour, billed in six minute increments, for financial planning services. A minimum of two hours is payable upon receipt of a signed Advisory contract, with any additional fee owned payable upon presentation of the financial plan. In certain instances, or for those clients who desire it, the firm may charge a fixed fee for financial planning services. Fixed fees are payable 1/3 upfront, with the remainder to be paid upon presentation of the financial plan. Fixed fees can range from $200 to $2,000, and are based on the complexity of the work required. All financial planning fees are negotiable.

Additional Fee Information and Disclosures:
All Advisory fees are negotiable between the firm and clients. Generally, managed account clients have fees deducted directly from their accounts.

In addition, as noted in Item 4 above, clients invested in mutual funds and/or variable annuities will pay an Advisory fee to Brookstone, and indirect management fees and expenses as charged by the mutual fund or variable contract. Therefore, clients whose assets are invested in shares of mutual funds and variable contracts are hereby made aware that they will pay both a direct management fee to Brookstone and an indirect management through the mutual fund or variable annuity.

Brookstone Capital Management LLC will provide investment advisory services, portfolio management services, and financial planning services, but will not provide custodial or other administrative services. At no time will Brookstone accept or maintain custody of a client's funds or securities. Client is responsible for all custodial and securities execution fees charged by the custodian and executing broker-dealer. The Advisors fee is separate and distinct from the custodian and execution fees.

The President of Brookstone Capital Management LLC and some advisory agents are also registered representatives of Center Street Securities, and are engaged in the business of selling life, health, long-term care, disability and annuity insurance products as well as securities. The other Investment Adviser Representatives of Brookstone Capital Management LLC may also be registered representatives of other non-affiliated broker/dealers or insurance companies engaged in the business of selling securities, life, health, long-term care, disability and annuity products. As registered representatives, associates may receive separate yet typical compensation in the form of commissions for the purchase of securities through their affiliated broker-dealer as well as for the sale of insurance products.

8

32

Because these are non affiliated entities, we do not believe that this poses any potential conflict of interest. However, Brookstone takes numerous actions to address these potential conflicts. As a Fiduciary, the firm, via its Management and Compliance Department, works to ensure that clients best interests are used when determining investment recommendations, including review of all advisory recommendations. Clients are NOT free to choose their own brokerage firm or custodian. They must use our custodian, TDAmeritrade. In addition, Brookstone maintains a Code of Ethics to help ensure that investment decisions are in the best interest of clients, as disclosed in Item 11 below.

## ITEM 6 – PERFORMANCE BASED FEES AND SIDE-BY-SIDE MANAGEMENT

Brookstone does not charge any performance based fees of any kind (those fees that are based upon a share of capital gains or capital appreciation of client assets).

## ITEM 7 – TYPES OF CLIENTS

Brookstone provides its Advisory Services to individuals, families, retirement plans, trusts, estates, charitable organizations, or other business entities. While Brookstone Capital Management enforces no minimum account size, the firm recommends a cumulative household minimum account size is $25,000. The 'SmartOption' Program has a minimum account size of $60,000. However, based on individual facts and circumstances, Brookstone Capital Management LLC may, at its sole discretion, accept accounts with a lower value.

## ITEM 8 – METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS

Investing in securities of any kind involves risk, including loss of investment, that clients must be prepared to accept.

Brookstone provides investment advice based upon long-term investment strategies that incorporate the principles of Modern Portfolio Theory. Generally, the firm provides advice on the following types of securities: stocks (exchange listed, over-the-counter, and foreign issues); bonds (corporate debt); certificates of deposit; municipal securities; variable annuities; mutual funds and exchange traded funds (ETFs); Options contracts; and partnerships investing in real estate. In addition, in certain instances the firm purchases put options on the market.

9

33

## ITEM 9 · DISCIPLINARY INFORMATION

Firms are required to report any legal or disciplinary events that are material to a client's evaluation of our advisory business and the integrity of our management.

In February of 2008, the Kentucky Division of Securities found the firm and advisory representative James Jones in violation of Kentucky rules for permitting Mr. Jones to transact business in the state without prior registration. The firm paid a $2,000 fine in May of 2008, and both the firm and the advisory representative were permitted to register in the state.

In addition, there are certain advisory affiliates of this firm that do have reportable events, which are reportable under this item. The advisory affiliate related items are reported below.

Matthew Rettich: Hawaii Division of Insurance found Mr. Rettich in violation of disclosure rules for failing to disclose a trespassing charge on Mr. Rettich's record from when he was 18 years of age. The Division issued a letter of reprimand.

Stacey Manderloh Tate: Commission of Insurance for the State of Texas fined Ms. Tate $2,300 in July of 2002 for violations of advertising rules for failing to report a change of address and report additional offices, as well as accepting commissions from an unlicensed entity for insurance services.

Bonnie Griffith: In January of 2005, Ms. Griffith was fined $1,500 by the Illinois Division of Insurance for selling 2 insurance contracts with unauthorized insurer in the state of Illinois.

Additional information regarding the above reportable events can also be found at the SEC's public disclosure website, which can be accessed at www.advisorinfo.sec.org.

## ITEM 10 · OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

President Dean Zayed is a shareholder in the law firm of Perkins & Zayed, PC. From time to time, Perkins & Zayed, PC may provide legal services for clients of Brookstone Capital Management LLC. These agreements will be disclosed by Brookstone Capital Management LLC at the time the advisory agreement is entered into by delivery of Brookstone Capital Management LLC's Form ADV Part II to the client. Dean Zayed is also a shareholder of CD Revolution, Inc., an Illinois Corporation engaged in the design and distribution of structured products, including market linked certificates of deposit and various structured notes. CD Revolution Inc. may earn a consulting fee in this capacity and some of the products it helps design and distribute may be purchased as part of the portfolio that Brookstone manages for its clients. Finally, Mr. Zayed is also a registered

10

34

representative of Center Street Securities and is engaged in the business of selling life, health, long-term care, disability and annuity insurance products as well as securities.

The other Investment Adviser Representatives of Brookstone Capital Management LLC may also be registered representatives of broker/dealers engaged in the business of selling securities, life, health, long-term care, disability and annuity products. As registered representatives, associates may receive separate yet typical compensation in the form of commissions for the purchase of securities products through their affiliated broker-dealer as well as for the sale of insurance products.

Investment Adviser Representatives for Brookstone Capital Management LLC may also sell life, health, long-term care, disability and annuity insurance products.

## ITEM 11 – Code of Ethics, Participation or Interest in Client Transactions, and Personal Trading

**Code of Ethics**

Brookstone maintains a companywide Code of Ethics. Brookstone's Code includes various prohibited activities, requires all firm employees to adhere to high ethical standards, and requires that covered persons place client interests ahead of their own. The Code also requires all employees subject to the Code to comply with all applicable laws related to the firm's advisory business, and requires that all employees be bound by the Anti-Fraud Provisions of federal securities law.

In addition, the Code requires that certain transactions by firm personnel be pre-approved, and that firm personnel report all reportable holdings and transactions to firm management on a regular basis. A copy of Brookstone's Code of Ethics is available to existing and prospective clients upon request at the firm's main office address and phone number, as listed on the Cover Page of this Brochure.

**Participation or Interest in Client Transactions and Personal Trading**

Principals and/or officers of Brookstone may manage his/her own accounts in the same manner Brookstone uses to manage client assets. As such, firm personnel may own the same securities or other investments that client accounts contain. Client transactions are executed either prior to or simultaneously with those of the principals. All employee transactions are reviewed by the Compliance Department to ensure that any conflicts can be identified and addressed.

Brookstone Capital Management LLC and/or its advisory representatives may from time to time purchase or sell products that they may recommend to clients. Brookstone Capital Management LLC has adopted a Code of Ethics that sets forth the basic policies of ethical conduct for all managers, officers, and employees of the adviser. In addition, the Code of Ethics governs personal trading by each employee of Brookstone Capital Management LLC deemed to be an Access Person and is intended to ensure that

35

securities transactions effected by Access Persons of Brookstone Capital Management LLC are conducted in a manner that avoids any actual or potential conflict of interest between such persons and clients of the adviser or its affiliates. Brookstone Capital Management LLC collects and maintains records of securities holdings and securities transactions effected by Access Persons. These records are reviewed to identify and resolve potential conflicts of interest.

Additionally, when executing securities trades in personal securities accounts, Investment Advisor Representatives and supervised persons must be especially careful to make sure that such trading activities are:

1. not conducted in advance of client transactions in similar securities.
2. not in opposition to recommendations made for client securities transactions.
3. not based upon inside information or research analyst reports that the adviser prepared.
4. not otherwise in violation of applicable securities laws or fiduciary duties owed to clients.

Where acting in the capacity of a registered representative of a registered broker/dealer, advisory representatives of Brookstone Capital Management LLC may as broker or agent effect securities transactions for typical and customary compensation. Clients are not obligated to use advisory representatives of Brookstone Capital Management LLC to execute such securities transactions.

Brookstone does not conduct 'Principal' transactions, does not engage in Cross-Trades between advisory clients, and does not participate in Agency Cross Transactions.

## ITEM 12 – BROKERAGE PRACTICES

As an investment advisory firm, Brookstone Capital Management LLC has a fiduciary duty to seek best execution for client transactions. While best execution is difficult to define and challenging to measure, there is some consensus that it does not solely mean the achievement of the best price on a given transaction. Rather, it appears to be a collective consideration of factors concerning the trade in question. Such factors include the security being traded, the price of the trade, the speed of the execution, apparent conditions in the market, and the specific needs of the client. Brookstone Capital Management LLC's primary objectives when placing orders for the purchase and sale of securities for client accounts is to obtain the most favorable net results taking into account such factors as 1) price, 2) size of order, 3) difficulty of execution, 4) confidentiality and 5) skill required of the broker. Brookstone Capital Management LLC will recommend a broker-dealer to clients. The broker-dealer has been chosen based on the following: 1) the broker's capital depth, 2) the broker's market access, 3) the broker's transaction confirmation and account statement practices, 4) our knowledge of negotiated commission rates and spreads currently made available, 5) the nature and character of the markets for the security to be purchased or sold, 6) the desired timing of

12

Document received on 7/10/18 11:49 AM Document accepted on 07/10/2018 15:03:55 # 4316662/170431017609

the transaction, 7) the execution, 8) clearance and settlement capabilities of the broker selected and others considered, 9) our knowledge of any actual or apparent operational problems of a broker and 10) the reasonableness of the commission or its equivalent for the specific transaction. Based on the above criteria, Brookstone Capital Management LLC may not necessarily pay the lowest commission or commission equivalent as specific transactions may involve specialized services on the part of the broker. This would justify higher commissions (or their equivalent) than other transactions requiring routine services. If Brookstone Capital Management LLC is directed by the client to direct trades to a specific broker dealer other than the custodian typically used by Brookstone Capital Management LLC for trade execution, it is disclosed that Brookstone Capital Management LLC's ability to negotiate commissions (where applicable), obtain volume discounts, or otherwise obtain best execution may not be as favorable as might otherwise be obtained.

Order Aggregation:
Brookstone Capital Management LLC may combine orders into block trades when more than one account is participating in the trade. This blocking or bunching technique must be equitable and potentially advantageous for each such account (i.e. for the purposes of reducing brokerage commissions or obtaining a more favorable execution price). Block trading is performed when it is consistent with the duty to seek best execution and is consistent with the terms of Brookstone Capital Management LLC's investment advisory agreements. Equity trades are blocked based upon fairness to client, both in the participation of their account, and in the allocation of orders for the accounts of more than one client. Allocations of all orders are performed in a timely and efficient manner. All managed accounts participating in a block execution receive the same execution price (average share price) for the securities purchased or sold in a trading day. Any portion of an order that remains unfilled at the end of a given day will be rewritten on the following day as a new order with a new daily average price to be determined at the end of the following day. Due to the low liquidity of certain securities, broker availability may be limited. Open orders are worked until they are completely filled, which may span the course of several days. If an order is filled in its entirety, securities purchased in the aggregated transaction will be allocated among the accounts participating in the trade in accordance with the allocation statement. If an order is partially filled, the securities will be allocated pro rata based on the allocation statement. Brookstone may allocate trades in a different manner than indicated on the allocation statement (non-pro rata) only if all managed accounts receive fair and equitable treatment.

Where Brookstone Capital Management LLC does not exercise brokerage discretion, it may recommend brokers to clients for execution and/or custodial services where requested by the client. Clients are not obligated to use the recommended broker and will not incur any extra fee or cost associated with using a broker not recommended by Brookstone Capital Management LLC. Brookstone Capital Management LLC may recommend brokers based on criteria such as, but not limited to, reasonableness of commissions charged to the client, services made available to the client, and location of broker offices. Brookstone Capital Management LLC is not compensated in any way with respect to making such recommendations. When referring clients to dealers

37

Brookstone Capital Management LLC will only refer clients to dealers registered in states where the clients reside

Brookstone Capital Management LLC does not receive research services, other products, or compensation as a result of recommending a particular broker which may result in the client paying higher commissions than those obtainable through other brokers.

Brookstone Capital Management LLC participates in the institutional advisor program (the "Program") offered by TD Ameritrade Institutional. TD Ameritrade Institutional is a division of TD Ameritrade Inc., member FINRA/SIPC/NFA ("TD Ameritrade "), an unaffiliated SEC-registered broker-dealer and FINRA member. TD Ameritrade offers to independent investment advisors services which include custody of securities, trade execution, clearance and settlement of transactions. BCM receives some benefits from TD Ameritrade through its participation in the Program.

Brookstone Capital Management participates in TD AMERITRADE's INSTITUTIONAL customer program and Brookstone Capital Management requires clients to maintain accounts with TD AMERITRADE for custody and brokerage services. There is no direct link between Brookstone Capital Management's participation in the program and the investment advice it gives to its clients, although Brookstone Capital Management receives economic benefits through its participation in the program that are typically not available to TD AMERITRADE retail investors. These benefits include the following products and services (provided without cost or at a discount): duplicate client statements and confirmations; research related products and tools (including Brookstone's Morningstar subscription as well as Albridge, a back office performance and reporting system) and Tamarac; consulting services; access to a trading desk serving advisor participants; access to block trading (which provides the ability to aggregate securities transactions for execution and then allocate the appropriate shares to client accounts); the ability to have advisory fees deducted directly from client accounts; access to an electronic communications network for client order entry and account information; access to mutual funds with no transaction fees and to certain institutional money managers; and discounts on compliance, marketing, research, technology, and practice management products or services provided to Brookstone Capital Management by third party vendors. TD AMERITRADE may also have paid for business consulting and professional services received by Brookstone Capital Management's related persons, and may also pay or reimburse expenses (including travel, lodging, meals and entertainment expenses) for Brookstone Capital Management's personnel to attend conferences or meetings relating to the program or to TD AMERITRADE's advisor custody and brokerage services generally. Some of the products and services made available by TD AMERITRADE through the program may benefit Brookstone Capital Management but may not benefit its client accounts. These products or services may assist Brookstone Capital Management in managing and administering client accounts, including accounts not maintained at TD AMERITRADE. Other services made available by TD AMERITRADE are intended to help Brookstone Capital Management manage and further develop its business enterprise. The benefits received by Brookstone Capital Management (or its personnel) through participation in the program do not depend on the

14

Document received on 7/10/18 11:49 AM Document accepted on 07/10/2018 15:03:55 # 4316662/170431017609

amount of brokerage transactions directed to TD AMERITRADE. Clients should be aware, however, that the receipt of economic benefits by Brookstone Capital Management or its related persons in and of itself creates a potential conflict of interest and may indirectly influence Brookstone Capital Management's choice of TD AMERITRADE for custody and brokerage services.

Brookstone Capital Management also receives from TD AMERITRADE certain additional economic benefits ("Additional Services") that may or may not be offered to any other independent investment advisors participating in the program. (Brookstone may make these additional services available to its affiliates without cost.) Specifically, the Additional Services include Albridge, the firm's back office performance and reporting system, as well as the firm's subscription to Morningstar, and Tamarac. TD AMERITRADE provides the Additional Services to Brookstone Capital Management in its sole discretion and at its own expense, and Brookstone Capital Management does not pay any fees to TD AMERITRADE for the Additional Services. Brookstone Capital Management and TD AMERITRADE have entered into a separate agreement ("Additional Services Addendum") to govern the terms of the provision of the Additional Services.

As part of our agreement with TD Ameritrade, TD Ameritrade provides the firm with payment coverage for "Morningstar Advisor Workstation", "Albridge Solutions Wealth Reporting", and "Tamarac". These services are used in conjunction with the firm's advisory practice, and provide direct and/or indirect beneficial benefit to all firm clients, whether those clients utilize TD Ameritrade or not. While there is no direct link between this and the advice provided to firm clients, this arrangement could be considered a conflict of interest that clients are herein made aware of, and which clients should consider when choosing an advisor. The benefits described above are not dependent on specific dollar amounts of brokerage transactions directed to TD Ameritrade by this firm.

Brookstone Capital Management's receipt of Additional Services raises potential conflicts of interest. In providing Additional Services to Brookstone Capital Management, TD AMERITRADE most likely considers the amount and profitability to TD AMERITRADE of the assets in, and trades placed for, Brookstone Capital Management's client accounts maintained with TD AMERITRADE. TD AMERITRADE has the right to terminate the Additional Services Addendum with Brookstone Capital Management, in its sole discretion, provided certain conditions are met. Consequently, in order to continue to obtain the Additional Services from TD AMERITRADE, Brookstone Capital Management may have an incentive to recommend to its clients that the assets under management by Brookstone Capital Management be held in custody with TD AMERITRADE and to place transactions for client accounts with TD AMERITRADE. In addition, Brookstone Capital Management shares the Additional Services with its affiliated entities. Consequently, Brookstone Capital Management's clients' brokerage commissions and custodial fees generated at TD AMERITRADE may be used to benefit Brookstone Capital Management's affiliates. Brookstone Capital Management's receipt of Additional Services does not diminish its

15

39

duty to act in the best interests of its clients, including to seek best execution of trades for client accounts.

## ITEM 13 – REVIEW OF ACCOUNTS

Accounts are monitored on an ongoing basis by Dean Zayed. The triggering factors would be Brookstone Capital Management becomes aware of a change in client's investment objective, a change in market conditions, change of employment, re-balancing of assets to maintain proper asset allocation and any other activity that is discovered as the account is reviewed. The client will receive written statements no less than quarterly from the trustee or custodian. In addition, the client will receive other supporting reports from Mutual Funds, Asset Managers, Trust Companies or Custodians, Insurance Companies, Broker/Dealers and others who are involved with client accounts.

The client is encouraged to notify the Advisor and Investment Advisor Representative if changes occur in his/her personal financial situation that might adversely affect his/her investment plan.

Brookstone has the ability to prepare written quarterly reports reflecting current positions and valuations which are provided to all clients for managed accounts. Third party custodians also provide monthly. Financial planning clients receive a written copy of their financial plan with all supporting analyses

## ITEM 14 – CLIENT REFERRALS AND OTHER COMPENSATION

Brookstone Capital Management LLC may enter into solicitor relationships with individuals ("Solicitors") who in turn offer our services to members of the public. Through these arrangements, we pay a cash referral fee to the Solicitor based upon a percentage of our advisory fee. The referral fee is paid pursuant to a written agreement and this information is disclosed to Clients prior to or at the time of entering into an investment advisory agreement.

**TD Ameritrade Institutional Advisor Panel**
On behalf of Registrant, Registrant serves on the TD Ameritrade Institutional Advisor Panel ("Panel"). The Panel consists of approximately twenty-four independent investment advisors that advise TD Ameritrade Institutional ("TDA Institutional") on issues relevant to the independent advisor community. The Panel meets in person on average three to four times per year and conducts periodic conference calls on an as needed basis. Investment advisors are appointed to serve on the Panel for two year terms by TDA Institutional senior management. An investment advisor may serve longer than two years if appointed to additional terms by TDA Institutional senior management. Registrant's current term expires on January 18, 2014. At times, Panel members are

16

40

provided confidential information about TDA Institutional initiatives. Panel members are required to sign confidentiality agreements. TD Ameritrade, Inc. ("TD Ameritrade") does not compensate Panel members. However, TD Ameritrade pays or reimburses Registrant for the travel, lodging and meal expenses Registrant incurs in attending Panel meetings. The benefits received by Registrant or its personnel by serving on the Panel do not depend on the amount of brokerage transactions directed to TD Ameritrade. Clients should be aware, however, that the receipt of economic benefits by Registrant or its related persons in and of itself creates a potential conflict of interest and may indirectly influence Registrant's recommendation of TD Ameritrade for custody and brokerage services.

## ITEM 15 – CUSTODY

Brookstone does not maintain Custody of client funds or securities. All funds are held by the Brokerage firm or Custodian firm, in most cases, TD Ameritrade. The Brokerage firm or Custodian firm send monthly or quarterly statements directly to clients on a regular basis. These statements must be carefully and thoroughly reviewed by clients. Brookstone encourages all clients to carefully compare quarterly reports provided by this firm to custodial or brokerage statements issued by the applicable brokerage or custodial firms.

## ITEM 16 – INVESTMENT DISCRETION

Brookstone Capital Management LLC generally has discretion over the selection and amount of securities to be bought or sold in client accounts without obtaining prior consent or approval from the client. However, these purchases or sales may be subject to specified investment objectives, guidelines, or limitations previously set forth by the client and agreed to by Brookstone Capital Management LLC.

Discretionary authority will only be authorized upon full disclosure to the client. The granting of such authority will be evidenced by the client's execution of an Investment Advisory Agreement containing all applicable limitations to such authority. All discretionary trades made by Brookstone Capital Management LLC will be in accordance with each client's investment objectives and goals.

## ITEM 17 – VOTING CLIENT SECURITIES

Brookstone Capital Management LLC will not vote, nor advise clients how to vote, proxies for securities held in client accounts. The client clearly keeps the authority and responsibility for the voting of these proxies. Also, Brookstone Capital Management

41

LLC cannot give any advice or take any action with respect to the voting of these proxies. The client and Brookstone Capital Management LLC agree to this by contract.

For accounts subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), the plan fiduciary specifically keeps the authority and responsibility for the voting of any proxies for securities held in plan accounts. Also, Brookstone Capital Management LLC cannot give any advice or take action with respect to the voting of these proxies.

## ITEM 18 – FINANCIAL INFORMATION

Brookstone does not require prepayment of more than $1,200 in fees per client six months or more in advance – as such, a Balance Sheet is not required and not attached. There is also no known financial condition that is reasonably likely to impair this firm's ability to meet contractual commitments to clients, and the firm has not been the subject of a bankruptcy proceeding.

## ITEM 19 – STATE REGISTERED ADVISORS

As Brookstone is an SEC registered advisor and not a State registered advisor, this item is not applicable.

18

42

*ROBERT HORVATH, ET AL*

*v.*

*NADIM KHALIL ZAYED a/k/a  DEAN ZAYED,*
*BROOKSTONE CAPITAL MANAGEMENT*
*LLC, and KAIZEN ADVISORY, LLC,*

# EXHIBIT B

Document received on 7/10/18 11:49 AM  Document accepted on 07/10/2018 15:03:55 # 4316662/170431017609

1.  **Trade diversification.** Rather than having two or four individual option contracts in your account, the fund will hold multiple contracts equally allocated to all shareholders. The mutual fund will engage in a series of different spread trades throughout a month, placing trades on multiple indices with various expirations. The owner of the mutual fund, therefore, will be exposed to a diversified set of credit spreads at most times.

2.  **Volatility hedge.** The mutual fund will incorporate a hedging strategy that seeks to mitigate losses in the event of a "gap down" or sudden and extreme decline in the market. A sharply declining market generally negatively affects the Fund's credit put spreads. To hedge against this, the mutual fund intends to purchase and sell call and put options or futures on the CBOE Volatility Index® (the "VIX®"), which is considered a benchmark for stock market volatility. The value of a VIX® hedge typically increases during sudden and extreme market declines. This addition to the HiPOS strategy will provide a partial hedge for the portfolio and is designed to protect the portfolio from catastrophic losses during a market dislocation and even a "black swan" event.

3.  **Trade Execution.** By trading on a fund level we expect to receive better trade execution and generally more favorable pricing. The mutual fund has a prime broker relationship that gets us even more direct access to the options market, more potential counterparties, and the ability to place and execute trades at faster speeds.

4.  **Daily Liquidity.** The fund will be priced at the market close allowing for additions or withdrawals to be made on a daily basis.

Below are a few common questions that may arise from this transition:

**How will the mutual fund be taxed?** The mutual fund will retain the same tax treatment that the SMA currently enjoys since the mutual fund will trade only index options (Section 1256 contracts). Therefore, for non-qualified accounts, all gains within the fund will be taxed as 60% long term capital gains and 40% short term capital gains.

**How will the fee structure change?** The mutual fund currently has a maximum expense ratio of 1.85% via the class I share. The standard BCM advisory fee on assets in the mutual fund is 1%. The total expense structure for being invested in the fund is higher than the standard management fee currently being charged for the HiPOS strategies, however, we believe the added value of trade diversification, the VIX hedge, trade execution capabilities and daily liquidity justify the additional expense.

**Will the mutual fund pay a regular dividend or capital gains?** The mutual fund will make distributions of net investment income annually and net capital gains, if any, at least annually, typically in December. The fund may make additional payments of dividends or distributions if it deems it desirable.

**How will my experience change?** You will own shares of an open end mutual fund. You will no longer see the actual trading activity via separate confirmation statements. Your investment in HiPOS will be reflected on your monthly TD Ameritrade statement.

We take great pride in our proactive and deliberate approach to selecting, monitoring and managing the investment strategies on the BCM platform. We wouldn't make these changes if we didn't feel they were imperative to maintaining the best solutions for your investment needs. As always, you may contact your Brookstone advisor, David Blickhan, with any questions and thank you again for being part of Brookstone Capital Management.

Sincerely,

Dean Zayed
President and CEO

1745 S. Naperville Rd., Suite 200 | Wheaton, IL 60189 | P: 630.653.1400 | F: 630.653.4025 | brookstonecm.com